Edna H. SOBEL, M.D., and Bella C. Clutario, M.D., on behalf of themselves and other professional faculty members employed by the Defendant, Yeshiva University, similarly situated, Plaintiffs,

and

Equal Employment Opportunity Commission, Plaintiff-Intervenor,

v.

YESHIVA UNIVERSITY, Ephraim Friedman, M.D., Chester Edelman, Jr., M.D., Emanuel Genn, Henry L. Barnett, M.D., Labe C. Scheinberg, Harold Schulman, M.D., Neal Bricker, M.D., Edward J. Hehre, M.D., Henry P. Lauson, M.D., and Arthur S. Abramson, M.D., Defendants.

No. 75 Civ. 2232(GLG).

United States District Court,
S. D. New York.

Jan. 28, 1980.

See also, D.C., 438 F.Supp. 625.

Bonnie P. Josephs, and John Doar, New York City, for plaintiffs.

Sidney Schutz and Winer, Neuburger & Sive, New York City, for defendants by Daniel Riesel, Mark A. Chertok, Anne C. Vladeck, New York City.

Equal Employment Opportunity Commission, intervenor, Washington, D. C. by Richard P. Theis, Washington, D. C., of counsel.

OPINION

GOETTEL, District Judge:

In this more than four and a half year old class action, the plaintiffs have now, pursuant to Fed.R.Civ.P. 23(c)(1), moved to redefine and recertify the class.[1]

The instant action, as pled in the complaint and the amended complaint, was brought by the named plaintiffs on behalf

---

1. Initially, plaintiffs moved for reargument of a prior motion to amend the complaint, pursuant to General Rule 9(m) of this court. The motion was not appropriately brought under that rule since voluminous new papers and "developing facts" were submitted. It would, however, appear to be procedurally proper under Rule 23(c)(1).

of all female physicians on the faculty of the Albert Einstein College of Medicine ("AECOM"). It was so pled despite the fact that the plaintiffs, along with the other parties to the action, and the Court, had been aware throughout the litigation that there were some teachers at AECOM who did not hold the degree of doctor of medicine ("M.D."). The plaintiffs, however, have apparently only recently realized that the majority of women professors at AECOM fall into this category, holding, primarily, doctors of philosophy ("Ph.D.s").

Prior to this motion, the plaintiffs had moved to file a second amended complaint which, *inter alia*, would have expanded the class to include all female faculty members, regardless of degree held. That motion was denied in this Court's opinion of September 26, 1979, *Sobel v. Yeshiva University*, 477 F.Supp. 1161 (S.D.N.Y.1979), wherein it was held that the class of AECOM faculty members deemed to be represented would continue to be limited to those women professors holding the degree of M.D.[2]

The plaintiffs have now moved to redefine and recertify the class. They have done so, however, by putting forward several rather startling propositions. Initially, they contend that the term "physician" as used in the complaint and amended complaint should be given a broad interpretation and read to refer to persons holding any doctorate degrees since Ph.D.s, Doctors of Science (D.Sc.s), Doctors of Education (D.Ed.s), and M.D.s, are all, like physicians, "doctors." This argument is so frivolous as to not require further response. Alternatively, they assert that the Court unintentionally excluded persons, such as Doctors of Dental Surgery and Doctors of Veterinary Medicine,[3] who are not medical doctors, but whose degrees qualify them to treat certain types of medical conditions. While this point was not previously raised,

the Court has had experience with dentists and veterinarians and has found their functions to be dissimilar from those of a medical doctor.

Finally, the plaintiffs contend that the modification of the class is necessary "because the Court mistakenly believed that the pattern of sex discrimination in employment against female M.D.s on the faculty differs from that against female non-M.D.s on the faculty." Affidavit of Edna H. Sobel, M.D., at ¶ 2. Initially it should be noted that this Court has never suggested that *any* pattern of sex discrimination exists against any of the faculty. Indeed, that is the prime issue in this litigation. Moreover, the Court has never believed nor suggested that, if sex discrimination does exist, it is practiced differently against female professors who are not medical doctors. To the extent that the point has ever been previously considered, the position of the Court was that there was an absence of typicality and commonality between professors who are M.D.s and those who are not, and that as a result their inclusion within one class would be inappropriate.

The plaintiffs have now filed voluminous papers with the Court in an attempt to demonstrate to it the numerous similarities of status that exist between all members of the college's teaching staff, regardless of degree. Undoubtedly, there are many such similarities. Yet, the Court remains unconvinced by the plaintiffs' argument. The essential difference between the functions of the physician and non-physician professors is that the physicians are used primarily in teaching clinical courses, during which actual care and treatment of patients take place, while the non-M.D.s primarily teach courses involving theoretical subjects. The plaintiffs, attempting to blur this distinction, note that the sharp differentiation of

---

2. It has been called to the Court's attention that, in dealing with the various motions discussed in the aforementioned Opinion, the Court did not specifically address the defendant's motion to strike the intervenor's complaint for failure to respond to class motion interrogatories. No reason appears for compelling the E.E.O.C. to make responses separate from those made by the plaintiffs on behalf of the class. That motion is denied.

3. It would be intriguing to know why it is necessary to have veterinarians instructing persons training to be medical doctors.

classroom work and clinical work is no longer observed in the medical schools,[4] with students now commencing their clinical work in mid-March of their second year, and returning to the classroom for some basic and clinical science courses for a twelve week period during the third year of study. Nevertheless, while it may be true that this intermixing of theory and practice now occurs, and, undoubtedly provides a valuable teaching tool,[5] this does not alter the fact that, as a general proposition, the non-M.D. faculty teach the basic classroom courses while the physicians teach the clinical courses. It is acknowledged that the salary levels (and other perquisites) of those teaching the basic courses are not as great as those of the physicians teaching the clinical subjects.

Nor is there any merit to the contention that, because it would be difficult and time consuming to attempt to analyze the employment statistics for M.D.s separately from those for non-M.D.s, these two groups should be bunched together. While it is quite possible that there would be some difficulty in preparing such a study, it is clear to this Court that if there are differences in the positions the statistics, to be meaningful, would have to be analyzed separately.

Finally, there is another reason why faculty with an M.D. degree are in a better position than, and should be classified separately from, those with other degrees, and it is purely economic. In recent years our universities have been graduating students with Ph.D.s and other advanced degrees in numbers far greater than the economy can absorb. See N.Y. Times, March 18, 1979 § VI (Magazine), at 35; N.Y. Times, January 7, 1979 § XIII (Winter Survey of Education), at 16, col. 4. At the same time medical schools have been producing fewer M.D.s than the nation's needs dictate, a shortage that is predicted to last until the latter part of this decade. See N.Y. Times, June 14, 1979, at 30, col. 1; N.Y. Times, July 24, 1978, at 8, col. 6.[6] Consequently, while Ph.D.s must struggle to obtain the few jobs, primarily in the academic world,[7] that are available, ample positions exist for M.D.s. Physicians do not need to teach and, indeed, for many of them their teaching salaries may represent a financial loss over what they could obtain if they confined themselves solely to the practice of medicine.[8] Given this situation, with their greater earning potential, their more varied employment possibilities, and their greater prestige, it would be understandable to observe that, as a group, physicians are treated differently, and better than their non-M.D. counterparts at a school of medicine.

If the proportion of female faculty members at AECOM having a degree other than M.D. were the same as that for male members it is conceivable that this distinction in status would not be meaningful, and thus that some inclusion in the statistical analysis would be possible. This, however, is not the case, as the proportion of women professors holding other than M.D. degrees is higher than that for their male counterparts. As a result, this distinction has to be treated as a substantial factor affecting typicality and commonality.

The instant situation presents the difficult type of case which, as the Court has several times observed, cannot be evaluated simply on a person by person comparison. Two professors may appear to have identi-

---

4. At one time, apparently, the first two years of medical school were devoted primarily to classes, and the last two years to clinical clerkships, patient care and some internships.

5. It is regrettable that the law schools have not developed such an approach.

6. The explanation for this is an important and serious subject, but not one involved in this litigation.

7. The paucity of jobs in the academic world has, in fact, led to an increasing debate among educators as to the merits and detriments of continuing the traditional system of tenure now utilized at most universities. See N.Y. Times, January 16, 1979, § III, at 5, col. 4.

8. While there are a few M.D.s on the college staff who do not practice medicine, they make up, according to the statistics, less than one percent of the more than 1700 M.D. faculty members.

cal qualifications on paper, in terms, among others of degrees, experience, and papers published, and yet their actual capabilities and performance as professors may differ enormously. The only way that discrimination can be convincingly demonstrated in a case of this nature is by statistical evidence in which all consequential differences, except sex, are eliminated. Thus, while it may, as argued, be true that if female M.D. faculty members are discriminated against because of their sex, then non-M.D. female faculty members are likely to suffer from the same discrimination, any attempt to mix M.D.s and non-M.D.s in an indiscriminate statistical analysis would be to undermine the foundations of the analysis from the start.

If the problem of non-M.D. faculty members had been brought to the attention of the Court at an earlier stage of the litigation the obvious resolution would have been to set up two or more subclasses. After four and a half years of litigation, however, that is not a viable alternative. No excuse has been made for the failure to address this problem from the beginning, and the Court sees no reason why plaintiffs, at this late date, should be allowed to first address it now.[9]

The inclusion of non-M.D.s would approximately double, the class size. It could substantially complicate and prolong both the pretrial discovery in this action (in a case that has already been incredibly delayed) and would certainly lengthen the trial itself. Moreover, it would seem likely that any relief granted to the M.D. class in this action will, at least prospectively, enure to the benefit of all female faculty, regardless of degree.[10] Under these circumstances,

the motion to recertify the class at this time must be denied.

SO ORDERED.

---

9. It should be noted that the data necessary for a statistical breakdown of the AECOM faculty could have been readily obtained from a review of the list contained in the college's bulletin of faculty members and their degrees.

It may be that the two named plaintiffs, both of whom are M.D.s, were concerned (and not unrightly so) with their own situation and problem as to which they were well acquainted. This case, of course, originated in a more limited complaint solely against the Department of Pediatrics. The Department of Pediatrics has hundreds of faculty members and at least as of 1976–77, was overwhelmingly composed of M.D.s.

10. To the extent that there is a monetary judgment based on lost earnings, non-M.D.s could not participate and would, because of the statute of limitations, be barred from commencing new litigation with respect to certain years.